542 A.2d 1350

**In the Matter of the Honorable Joseph R. GLANCEY Municipal Court Philadelphia County.**

Supreme Court of Pennsylvania.

Argued April 13, 1988.

Decided May 27, 1988.

John Rogers Carroll, Philadelphia, for respondent.

Robert Keuch, Executive Director, Harrisburg, for J.I. R.B.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

NIX, Chief Justice.

This proceeding arises out of the alleged violations committed by Judge Joseph R. Glancey of the Philadelphia Municipal Court, Respondent herein, in his association with the Roofers' Union Local 30–30B. It is thus controlled to a large extent by our recent decision in *In the Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988), which resulted in the removal or suspension of eight of Respondent's colleagues. The proceeding likewise presents us with an issue concerning this Court's jurisdiction not discussed in that opinion, occasioned by Judge Glancey's recent resignation from the bench, and with challenges to the vitality of the *Cunningham* decision. Each will be addressed in turn.

Judge Glancey's conduct in this matter brought him before this tribunal once before. *In the Matter of Glancey*, 515 Pa. 201, 527 A.2d 997 (1987), presented us with the issue of whether the constitutional privilege against self-incrimination may be validly asserted by a judge in Pennsylvania, to avoid making financial disclosures mandated by Pennsylvania Supreme Court Order No. 47, promulgated April 13, 1984.[1] Judge Glancey had filed a Statement of Financial Interest for 1985 with the Administrative Office of Pennsylvania Courts ("AOPC") wherein he responded to Question 11, regarding gifts received during the year having a value of $200.00 or more, with the statement "Response respectfully declined at this time on grounds of constitutional privilege." AOPC referred the matter to the Judicial Inquiry and Review Board ("J.I.R.B." or "Board"),[2] which, following a hearing, concluded that Respondent knowingly and willfully failed to answer Question 11 in violation of Article V, section 17(b) of the Pennsylvania Constitution; Canons 1 and 2 of the Code of Judicial Con-

1. 503 Pa. XXXIV, 472 A.2d LIV.
2. Upon the concurrence of the parties, the Board consolidated the case against Judge Glancey with the case against Judge John J. Chiovero which involved similar conduct and identical issues.

duct; and 42 Pa.C.S. § 3302 ("Judges should not engage in any activity prohibited by . . . any other provision of law and shall not violate any canon of ethics prescribed by general rule."). The Board recommended removal of Respondent. Although we agreed with the Board's findings as to misconduct, we nevertheless declined to order removal because of a perceived lack of prior warning to Respondent that his conduct was prohibited. Accordingly, we allowed Respondent thirty (30) days to provide the required information, and stated that should he comply, the charges would be dismissed.

On July 2, 1987, Judge Glancey filed a letter with the AOPC amending his Statement of Financial Interest for 1985. Therein he responded to Question 11 in the following manner:

Source of Gift: Thomas Brown of Local 30, Roofers.
Address of Source of Gift: Philadelphia, PA.
Value of Gift: $300.00
Reason for Gift: Christmas Gift.

While the J.I.R.B. proceeded against Respondent for his initial failure to respond adequately to Question 11, the Federal Bureau of Investigation was conducting an investigation into racketeering activities involving the Roofers Union Local 30–30B. On October 23, 1986, a federal grand jury sitting in Philadelphia returned a sixty-one count indictment charging nineteen individuals with, *inter alia*, using kickback money from the Union's Prepaid Legal Services Plan to make cash payments to public officials, including a number of judges. Pursuant to the public disclosure of this activity, the Board initiated the instant inquiry. The J.I.R.B. requested and received access to information developed in the federal investigation, including evidence of an electronic surveillance of the Roofers Union hall and testimony elicited before the federal grand jury.

By letter dated December 12, 1986, Judge Glancey was formally charged with violations of Canons 1, 2, and 5C(1) of the Code of Judicial Conduct; Article V, section 17(b) of the Pennsylvania Constitution; and Supreme Court Order

No. 47. The charges alleged an acceptance of cash from a representative of the Roofers Union in the years 1983, 1984 and 1985, as well as a failure to report said payments for the years 1984 and 1985.[3] The Board amended these allegations by letter dated January 28, 1987, wherein it further alleged that Respondent provided false information to FBI agents investigating the payments, and that Respondent invoked his privilege against self-incrimination in a subsequent grand jury investigation. Respondent either denied or pleaded his Fifth Amendment privilege to these allegations.

The Board pursuant to J.I.R.B. Rule 24 petitioned this Court requesting the suspension of Respondent with pay during the pendency of the proceedings before the Board.[4] An order granting the prayer of the petition was entered on January 30, 1987. A hearing was held on April 13, 1987, before a Hearing Committee comprised of three members of the Board. Based upon evidence elicited at this hearing, the Board found insufficient clear and convincing evidence to support a finding that Respondent received a gift from the Union in 1983 or 1984. The Board also concluded that as a matter of law Respondent's invocation of his privilege against self-incrimination before the grand jury could not support an imposition of discipline, and thus dismissed the charges related to this conduct.

3. No disclosure was required for the year 1983 since Order No. 47 did not become effective until 1984.

4. Rule 24 of the Rules of Procedure Governing the Judicial Inquiry and Review Board provides in pertinent part:

(a) Incident to a preliminary investigation conducted pursuant to Rule 1 of these Rules or during a formal proceeding conducted pursuant to Rule 2 of these Rules, the General Counsel, with the concurrence of a reviewing member of the Board [as selected by the Board], may, upon their determination that the continued service of a judge is causing immediate and substantial public harm and an erosion of public confidence to the orderly administration of justice, which conduct appears to them to be a violation of the Code of Judicial Conduct or the Rules Governing Standards of Conduct of District Justices, petition the Supreme Court for injunctive or other appropriate interim relief, including temporary suspension or reassignment of the judge.

With regard to the remaining charges, the Board made the following factual determinations. Respondent was elected to the Philadelphia Municipal Court for a six-year term commencing in January 1982. Thomas Brown, a former employee of the Philadelphia Court of Common Pleas, distributed Christmas envelopes to judges of that court and the Philadelphia Municipal Court on behalf of the Roofers Union in the years 1983, 1984 and 1985. Brown testified during a videotaped deposition that, in December of 1985, he delivered two identical envelopes, each identified by three hash marks, to Respondent's chambers, placed them on the desk where respondent was working at the time, and said to Respondent, "Merry Christmas from the Union." William Markert, special assistant to Judge Glancey, informed the federal grand jury[5] that the judge had told him, also in December 1985, that there was an envelope for him from "Browny" on the judge's desk. That envelope contained $300. Despite this contact between Brown and Judge Glancey, the latter told FBI agents, during an official investigation of the matter, that he had not seen Brown for a year prior to December 1985, and that he had never received any cash from Brown or officials of the Union. He further told agents that acceptance of cash under these circumstances would be a "very improper thing" for a judge to do and that he would not do anything like that.

Based upon these facts, the Board found that Respondent had accepted $300 cash from the Roofers Union in 1985, and that he deliberately misinformed federal investigators upon denying receipt of cash from the Union. The Board concluded that this conduct warranted discipline under the constitutional and Code provisions charged, and a majority of the Board (with three members dissenting) recommended the removal of Respondent from his judicial office.

Two petitions were thereupon filed in this Court: one by the Board recommending removal, and a second by Respon-

---

**5.** The parties have stipulated that, were Mr. Markert to have testified before the Board, he would have done so consistent with his federal grand jury testimony. His testimony was thus admitted for the record by agreement.

dent seeking to set aside the report and recommendation of the Board. Subsequent to the filing of these petitions but prior to oral argument, this Court filed its decision in *In the Matter of Cunningham, supra,* removing or suspending eight judges for improper conduct involving the Roofers Union. Thereafter Judge Glancey tendered his resignation to the Governor on March 16, 1988, effective March 31, 1988. The Respondent then filed a Motion for Summary Disposition of this matter acknowledging his resignation and consenting to the entry of an order declaring him ineligible for election to judicial office in the future. The basis for the request was that the intervening resignation rendered the pending charges moot. We reserved judgment on the motion until the time of oral argument. The matter was argued before this Court on April 13, 1988, and the issues are now ripe for disposition.

As noted, subsequent to the filing of the petitions to this Court, Judge Glancey has sought to direct his own fate by resigning his judicial commission and assenting to an order permanently barring him from judicial service. The issue thus presented is whether that action rendered moot further consideration of the allegations of misconduct during his term as a judicial officer.

■ It is axiomatic that a court should not address itself to moot questions and instead should only concern itself with real controversies, except in certain exceptional circumstances. *See In re Gross,* 476 Pa. 203, 382 A.2d 116 (1978); *Sweeney v. Tucker,* 473 Pa. 493, 375 A.2d 698 (1977); *Colonial Gardens Nursing Home, Inc. v. Bachman,* 473 Pa. 56, 373 A.2d 748 (1977). Where other issues remain for adjudication, however, the case is not moot and the court must accept its responsibility to decide the matter. *See, e.g., Sweeney v. Tucker, supra.* This Court was recently faced with a factual scenario parallel to this case in *In the Matter of J.I.R.B. v. Snyder,* 514 Pa. 142, 523 A.2d 294 (1987). The respondent in that case had been charged with misconduct in connection with a trial over which he presided. Prior to this Court's action on the pending

charges, Judge Snyder failed in his bid for retention and was thus removed from office by the electorate. Recognizing that this left the question of Respondent's future ability to seek judicial office unresolved, we proceeded to determine whether a permanent bar was warranted. Notwithstanding Judge Glancey's consent to an order making him ineligible for future judicial service, the principles enunciated in *Snyder* are controlling in the instant case. As we stated in our previous decision,

> [t]his Court is responsible for maintaining the integrity of judicial administration so as to uphold public respect for the rule of law. Once instituted, our jurisdiction over disciplinary proceedings is thus only at an end when we issue a final order.

*Snyder*, 514 Pa. at 151, 523 A.2d at 298–299.[6]

Article V, section 18(*l*) is clear in its mandate that where the appropriate sanction for the errant behavior of a judicial officer justifies the imposition of the censure of removal, it carries with it a permanent bar against future judicial service. This is a clear mandate of the people that ineligibility for future service must be part of the sanction imposed. Thus, the mere termination of the present term of office does not comply with the constitutionally mandated punishment if the established conduct requires the imposition of the sanction of removal. Moreover, the binding effect of a gratuitous promise by a respondent not to seek or hold judicial office in this Commonwealth in the future is at best questionable. Once a matter is directed to this

6. Although our decision in *Snyder* was not unanimous, the Court spoke with one voice on the issue of whether this tribunal's constitutional authority ceases where an intervening act relieves the judge of his office. The language employed by the majority is quoted in the text. This writer, in a concurring opinion, wrote that "The jurisdiction of this Court over the disciplinary processes ... is not affected by termination of the judicial service during the course of these proceedings." *Snyder*, 514 Pa. at 154, 523 A.2d at 300 (Nix, C.J., concurring). Justice Papadakos reiterated this thought in stating that "this tribunal continues to have constitutional jurisdiction inspite [sic] of any intervening acts which result in a judge leaving office." *Id.*, 514 Pa. at 159, 523 A.2d at 302 (Papadakos, J., concurring and dissenting).

Court by the Board under subsection (g), *see* Article V, section 18(g), we are mandated to review the record.

> The Supreme Court shall review the record of the board's proceedings on the law and facts....

Article V, section 18(h).

If after the discharge of that responsibility we are convinced that the "just and proper" (Article V, section 18(h)) sanction would be removal, then it is our duty to assure not only that the offending jurist's current term of office is forfeited, but also that the miscreant is barred forever from holding judicial office. While resignation would satisfy the first part of that responsibility, it does not satisfy the latter. Therefore, if our mandatory review of the record results in a judgment that removal would be the "proper and just" remedy, even accepting the fact of resignation as satisfying the termination of the present term, we must enter an order *based upon our finding* declaring a permanent ineligibility to hold judicial office in the future.

■ After conducting an independent review of the record, we find the evidence of misconduct clear and convincing, both on the charge of accepting funds from the Roofers Union and on the charge of providing misleading information to FBI agents. We also believe our decision in *Cunningham* would warrant the removal of Respondent from his judicial post. Of those judges whose conduct was examined in *Cunningham,* three were found to have provided false or misleading information to federal investigators during official inquiries, in addition to accepting cash from the Union. We ordered removal in all three cases, and believe it is equally appropriate here.

At no point during the proceedings has Respondent attempted to distinguish *Cunningham.* Rather, Respondent has attempted to challenge this Court's view as expressed in *Cunningham.* Specifically, Respondent argues that gifts of this nature are not prohibited under our existing rules and that his conduct relating to the FBI investigation was not a basis for censure.

■ The thrust of Respondent's first argument is that Article V, section 17(c) of our constitution was not intended to address the conduct for which we employed it in *Cunningham*. Respondent contends that section 17(c) was designed to abolish the fee system for justices of the peace and was not aimed at forbidding gifts to judges. To accept this argument, however, would be to ignore the clear language of the constitutional provision. This we must not do.[7] Section 17(c), which prohibits the acceptance of "any fee, emolument or perquisite other than salary and expenses" for "any service connected with his office," clearly states that its proscriptions apply to every "justice, judge or justice of the peace." Article V, section 17(c). Further, it is clear that the Constitutional Convention of 1968 changed the language to include the judges of the minor judiciary when it drafted Article V, section 17(c)[8] to make them subject to a prohibition that previously applied to law trained judges. Contrary to Respondent's position, even before the 1968 amendment, law trained judges (Respondent falls within that category) were prohibited from the conduct here charged. The subsequent adoption of Article V, section 17(c) did not in any way change that mandate.

■ Nor do we find merit in Respondent's contention that our finding his conduct violative of section 17(c), for which he has not been charged, would contradict basic notions of due process. In *Cunningham* we considered this argument and rejected it.

7. In *Hellertown Mfg. Co. v. Commonwealth,* 480 Pa. 358, 365, 390 A.2d 732, 735 (1978), we stated that the Supreme Court "may resort to legislative history ... only *when the words of a law are not explicit* .... When the statute's meaning is plain, ... we cannot look to legislative history when to do so would alter the statute's plain meaning." (Emphasis in original) *See also,* 1 Pa.C.S. § 1921; *In re Fox's Estate,* 494 Pa. 584, 431 A.2d 1008 (1981).

8. Previously the Constitution of 1874, Article V, section 18, provided in part:
 The judges of the Supreme Court and the judges of the several courts of common pleas, and all other judges required to be learned in the law, ... shall receive no other compensation, fees or perquisites of office for their services from any source.
 *See also,* Constitution of 1776, section 23; Constitution of 1790, Article V, section 2.

The fact that the Board was concerned primarily with 17(b) and the provisions of the Code promulgated thereunder does not preclude this Court from making a finding of a violation under 17(c), if the record warrants such a finding. No rights of the respondents are offended by this Court assessing the conduct presented in this record in light of the prohibition set forth in 17(c), while reviewing the specific charges found to have been sustained by the Board.

*Cunningham,* 517 Pa. at 429, 538 A.2d at 479.

Respondent has presented no compelling reasons warranting alteration of this conclusion.[9]

Turning next to Respondent's argument that the Code does not preclude acceptance of a Christmas gift in the instant situation, we again find the issue resolved satisfactorily in our decision in *Cunningham* and believe no further discussion is necessary. We similarly dismiss Respondent's challenge to the notice provided by the canons in effect at the time of his dereliction. *See Cunningham,* 517 Pa. at 434 n. 17, 538 A.2d at 482 n. 17.

█ Respondent also contends that he should not be subject to sanction in this disciplinary proceeding for providing an untruthful exculpatory response to an accusatory inquiry propounded by FBI agents. He premises this contention on the lack of federal criminal law proscribing this conduct, arguing that 18 U.S.C. § 1001 (prohibiting false or

9. Respondent turns our attention to the United States Supreme Court decisions in In the *Matter of Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968) and *Dunn v. U.S.,* 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979), to support his argument. In both cases, the lower tribunal either found misconduct or based a finding of guilt upon conduct for which no charges had been brought. The Court held this action violated the appellant's due process rights in each case. In the instant case, Judge Glancey was fully apprised of what conduct had precipitated disciplinary action against him, and thus *Ruffalo* and *Dunn* do not control. Moreover, the Board charged him with violating Article V, section 17(b) of the Pennsylvania Constitution which proscribes "activity prohibited by law." Surely the drafters of this provision intended it to include constitutional prohibitions such as that found in section 17(c).

fraudulent statements to federal agents) [10] does not apply to investigations where a respondent has provided nothing more than an exculpatory negative response. The thought, apparently, is that because a simple denial is not made under oath, it should not be punished if untruthful so as to protect the unwitting citizen from the extreme pressure a federal investigation might engender. *See United States v. Chevoor*, 526 F.2d 178 (1st Cir.1975); *see generally, United States v. Capo*, 791 F.2d 1054 (2d Cir.1986), *on rehearing* 817 F.2d 947; *United States v. Grotke*, 702 F.2d 49 (2d Cir.1983); *United States v. Fitzgibbon*, 619 F.2d 874 (10th Cir.1980); *United States v. Schnaiderman*, 568 F.2d 1208 (5th Cir.1978); *Paternostro v. United States*, 311 F.2d 298 (5th Cir.1962). Notwithstanding the development of the "exculpatory no" doctrine in federal law, we believe such a response given by a judge of the court system in this Commonwealth warrants discipline.

■ Initially we note that the Code of Judicial Conduct is not limited in its scope to conduct punishable under the criminal laws of this or other jurisdictions. The commentary to Canon 2 specifically provides that "[a] judge must avoid all improbity and appearance of impropriety." Nowhere in the commentary or the Canon itself is this language limited to criminal conduct, nor will we allow this provision to be so restricted. Moreover, we must reject Respondent's argument that he should not be deprived of the "right" to provide an exculpatory, albeit untruthful, response to federal questioning because he too is a citizen. Again turning to the commentary to Canon 2, we find it

**10.** 18 U.S.C. § 1001 states:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

clearly states that a judge must "accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."

We do not believe that requiring a judge to respond honestly to an official inquiry would be unduly burdensome on the judicial official, nor do we believe that it creates a Hobson's choice which effectively abridges that official's rights under the Fifth Amendment to the United States Constitution. Nothing in this opinion or in *Cunningham* can be read as depriving a judge of his right to state that he will not answer a question on the basis of constitutional privilege. That being the case, we find Respondent's active concealment of information pertinent to the federal investigation to be violative of the public trust bestowed upon him. *See* Canons 1 and 2.

Having thus concluded that Respondent's conduct warrants severe discipline with no compelling reasons for us to hold otherwise, we would have no hesitancy in accepting the Board's recommendation of removal. In view of Judge Glancey's submission of resignation and its acceptance by the Governor, the entry of a formal order of removal is unnecessary. However, his resignation would not preclude him from seeking judicial office at some point in the future. Based upon his serious dereliction while he served in the office of judge, and our responsibility to maintain the integrity of the judicial system, it is appropriate that we enter an order forever barring Respondent from seeking or holding judicial office, pursuant to Article V, Section 18(*l*) of our constitution.[11]

Accordingly, we enter an order that Respondent herein is forever barred from holding judicial office in this Commonwealth.

11. At oral argument, counsel for the Board urged this Court to deny Respondent eligibility for pension benefits based upon Article V, section 16(b) of the Pennsylvania Constitution. However, because this question has not been properly presented before the Court, we will not consider it in this matter.

LARSEN, J., did not participate in the consideration or decision of this case.

PAPADAKOS, J., files a concurring opinion.

PAPADAKOS, Justice, concurring.

I join the opinion authored by Mr. Chief Justice Nix for two reasons. First, I am in full accord with the rationale and principles enunciated in pages 1 through 14 and the first paragraph of page 15 of the slip opinion. Second, I read the balance of the opinion to constitute an express removal of Judge Glancey from office. No other conclusion of this Court can justify the entry of an "order forever barring Respondent from seeking or holding judicial office, pursuant to Article V, Section 18(*l*) of our Constitution." (Opinion, p. 1356).

As Mr. Justice Zappala so succinctly stated in his concurring opinion in *Matter of Cunningham,* "I find no basis in the language of the Constitution for this Court to order a judicial officer to forfeit his office without ordering that he be 'removed' from office." 538 A.2d 473 at 491.

As Mr. Chief Justice Nix wrote in his concurring opinion in *Judicial Inquiry and Review Board v. Snyder,* 514 Pa. 142, 523 A.2d 294 (1987), "Under the scheme of Article V, Section 18 of our Constitution, a recommendation of removal by the Judiciary Inquiry and Review Board ("Board") requires this Court's action before it has efficacy." *Id.,* 514 Pa. at 153, 523 A.2d at 300. I cannot believe that the Chief Justice meant to say that the "Court's action" could be the avoidance of the entry of a formal order of removal.

I believe that perpetual banishment under Article V, Section 18(e) of our Constitution results automatically from this Court's action of removal. Accordingly, I can only conclude from the final disposition of this case by the majority that this Court has acted to remove Judge Glancey. Therefore, I join.